# STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

**Patricia Bradley Pitrolo,**
**Petitioner Below, Petitioner**

**FILED**

October 17, 2014

RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**vs)   No. 13-1309** (Kanawha County 10-D-2236)

**James Pitrolo Jr.,**
**Respondent Below, Respondent**


## MEMORANDUM DECISION

Petitioner Patricia Bradley Pitrolo, by counsel Mark A. Swartz and Mary Jo Swartz, appeals the Circuit Court of Kanawha County's order entered November 26, 2013, denying petitioner's appeal of a family court order modifying a final divorce decree. Respondent James Pitrolo Jr., by counsel James Wilson Douglas, filed a response in support of the circuit court's order to which petitioner replied.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

Petitioner Wife and Respondent Husband were married on December 29, 1990. On February 18, 2010, the parties entered into a postnuptial agreement, which stated, in pertinent part, that "[a]ll assets owned by either party are hereby and forever considered jointly owned and cannot be sold or disposed of without dual signatures." At trial, both parties acknowledged that the agreement was authentic and that both had signed in the presence of a notary. The agreement was originally Petitioner Wife's idea, but Respondent Husband sought to have it reduced to writing. Petitioner Wife wrote the agreement without the assistance of an attorney and gave it to Respondent Husband so that he could have it reviewed by an attorney. Respondent Husband alleges that at the time the agreement was signed, Petitioner Wife had been living outside the marital home and claimed that she would only return to the marital home if Respondent Husband signed the agreement.

After the agreement was signed, Respondent Husband contends that Petitioner Wife told him that the agreement did not properly provide for her two children from a prior marriage and allegedly told Respondent Husband that she destroyed the agreement. Petitioner Wife then filed for divorce on November 15, 2010. Respondent Husband contends that Petitioner Wife did not

1

reference the postnuptial agreement until March 22, 2012, in response to requests for admission, including that she made no reference to the same during her April 28, 2011, deposition. Petitioner Wife states she lost her copies of the agreement and only found the same in March of 2012. Petitioner Wife moved for partial summary judgment on the basis of the postnuptial agreement on May 21, 2012.

Prior to the marriage, Respondent Husband owned 40,565 shares of Heritage Bancshares, Inc. stock. He was also a member of the board and the executive committee of Heritage Bank. Respondent Husband contends that all of the appreciation during the marriage was passive, so there was no marital component to equitably divide in the divorce action. The parties did own other properties and investments which were each classified, valued, and distributed.

The parties were divorced by a final order dated September 27, 2012. The family court issued its "Final Order Granting Motions for Reconsideration Modifying Corrected Final Divorce Decree" on September 13, 2013. This Order equitably distributed all property deemed by the court to be marital property and found that the postnuptial agreement had been rescinded by both parties. Petitioner filed an appeal to the Circuit Court of Kanawha County on October 18, 2013, which was denied on November 26, 2013.

We review a circuit court's denial of an appeal from a family court order under the following standard:

> In reviewing a final order entered by a circuit court judge upon a review of, or upon a refusal to review, a final order of a family court judge, we review the findings of fact made by the family court judge under the clearly erroneous standard, and the application of law to the facts under an abuse of discretion standard. We review questions of law *de novo*.

Syl., *Carr v. Hancock*, 216 W.Va. 474, 607 S.E.2d 803 (2004).

On appeal, Petitioner Wife asserts five assignments of error. First, she asserts that the family and circuit courts erred in failing to apply West Virginia Code § 48-29-301 and in failing to enforce the written post-nuptial agreement. She argues that the circuit court erred in finding that the post-nuptial agreement was voided by her conduct, and argues that any repudiation of the written agreement must be made in writing. We disagree. West Virginia Code § 48-29-301 states:

> A contract between a husband and wife shall not be enforceable by way of action or defense, unless there is some writing sufficient to indicate that a contract has been made between them and signed by the spouse against whom enforcement is sought or by his or her authorized agent or broker.

There is no requirement that the agreement be rescinded in writing. We agree with the family court's detailed analysis as to how Petitioner Wife's actions in this case repudiated the written post-nuptial agreement.

2

Alternatively, Petitioner Wife argues her other four assignments of error. She argues error with respect to the following: (1) the manner the family court distributed appreciation in the value of Respondent Husband's bank stock; (2) denying Petitioner Wife's alimony claim; (3) the manner in which the family court distributed the marital estate and accounted for post-filing/separation credits and debits; and (4) failing to order Respondent Husband to contribute to Petitioner Wife's fees and costs. This Court finds no error in the family court's order nor in the circuit court's denial of the appeal of that order.

This Court agrees with the reasoning of the family court in the equitable distribution of the estate herein and relies upon the family court's well-reasoned order regarding appreciation of stock and the allocation of credits and debits. As to the alimony claim, this Court agrees with the family court's analysis regarding the cause of the dissolution of the marriage and notes that Petitioner Wife enjoys a high earning capacity based on her education and previous work experience, and affirms the denial of an award of alimony. Finally, this Court agrees that neither party is entitled to an award of attorney's fees based on *Banker v. Banker,* 196 W.Va. 535, 474 S.E.2d 465 (1996) and *Landis v. Landis,* 223 W.Va. 325, 674 S.E.2d 186 (2007).

Having reviewed the circuit court's "Order" entered on November 26, 2013, and the family court's "Final Order Granting Motions for Reconsideration Modifying Corrected Final Divorce Decree" entered on September 13, 2013, we hereby adopt and incorporate the circuit court's and family court's well-reasoned findings and conclusions as to the assignments of error raised in this appeal.[1] The Clerk is directed to attach a copy of the circuit court and family court's orders to this memorandum decision.

For the foregoing reasons, we affirm.

Affirmed.

**ISSUED:** October 17, 2014

**CONCURRED IN BY:**
Justice Margaret L. Workman
Justice Menis E. Ketchum
Justice Allen H. Loughry II

**DISSENTING:**
Chief Justice Robin Jean Davis

**DISQUALIFIED:**
Justice Brent D. Benjamin

---

[1] The Court has redacted the "Final Order Granting Motions for Reconsideration Modifying Corrected Final Divorce Decree" due to the sensitive nature of the proceedings. In addition, the Court removed the exhibits to that order, as they contain addresses and financial information that are not necessary for purposes of this decision.

13-1309

IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA FILED

2013 NOV 26 PM 3: 59

CATHY S. GATSON, CLERK
KANAWHA COUNTY CIRCUIT COURT

IN RE THE MARRIAGE OF:

PATRICIA BRADLEY PITROLO,

Petitioner,

v.

Civil Action No. 10-D-2236
Judge James C. Stucky

JAMES PITROLO, JR.,

Respondent.

## ORDER

On the 18th day of October, 2013, came the Petitioner, Patricia Bradley Pitrolo,

by counsel, Swartz Law Offices, PLLC, and filed with the Circuit Clerk of Kanawha

County, a petition for appeal in the above-styled civil action moving the Court to

reconsider the final order entered by Family Court Judge Ken Ballard on September 19,

2013.

Whereupon, after giving due and mature consideration to said written petition for

appeal, and after reviewing the official court file, the Court is of the opinion that a

hearing is not necessary to assist the Court in the decisional process.

The Court further finds that the challenged rulings of Judge Ken Ballard were

supported by substantial evidence, not clearly erroneous, and that no abuse of

discretion occurred.

Therefore, the Court is of the opinion to and does hereby ORDER that

Petitioner's petition for appeal is DENIED.

1

The Court hereby notes the objection and exception of the petitioner to this ruling and ORDERS that the Clerk forward a certified copy of this Order to Mark A. Swartz, Esquire, Post Office Box 1808, Saint Albans, West Virginia, 25177, James W. Douglas, Esquire, 181B Main Street, Sutton, West Virginia, 26601, and Ken Ballard, Family Court Judge.

Enter this Order the 25th day of November, 2013.

_____
JAMES C. STUCKY, Circuit Judge
Thirteenth Judicial Circuit

STATE OF WEST VIRGINIA
COUNTY OF KANAWHA, SS
I, CATHY S. GATSON, CLERK OF CIRCUIT COURT OF SAID COUNTY
AND IN SAID STATE, DO HEREBY CERTIFY THAT THE FOREGOING
IS A TRUE COPY FROM THE RECORDS OF SAID COURT.
GIVEN UNDER MY HAND AND SEAL OF SAID COURT THIS
DAY OF _____
_____ CLERK
CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

2

IN THE FAMILY COURT OF KANAWHA COUNTY, WEST VIRGINIA FILED

*IN RE: THE MARRIAGE OF:*

2013 SEP 13 PM 4: 07

PATRICIA LYNN BRADLEY PITROLO,

Petitioner,

v.

Civil Action No. 10-D-2236

JAMES LEWIS PITROLO, JR.,

Respondent.

## FINAL ORDER GRANTING MOTIONS FOR RECONSIDERATION MODIFYING CORRECTED FINAL DIVORCE DECREE

The above-styled civil action came on for review by the Court on July 11, 2013, before the Honorable Ken Ballard, Family Court Judge and reviewed the Petitioner's Motion to Reconsider and the Respondent's Motion to Reconsider the Corrected Final Order. The Petitioner did not appear in person, but her counsel, Mark Swartz appeared on her behalf. The Respondent James L. Pitrolo, Jr., appeared in person and by counsel, James Wilson Douglas.

After a review of said Motions for Reconsideration of Final Order, the Court is of the opinion to and does hereby GRANT said Motions for Reconsideration of Corrected Final Order. Therefore, the Court hereby modifies the Corrected Final Order as follows:

## FINDINGS OF FACT

I.    GENERAL:

A.    The Petitioner (hereafter 'Wife') and the Respondent (hereafter 'Husband') were divorced by a September 10, 2012 Final Order-Bifurcation of this Court, entered herein on

1

September 27, 2012, which Order reserved all other issues until the dates recited above.

B.     That the Wife was previously married and had two (2) male children. The Husband was previously married and had no children.

C.     That after their December 29, 1990 marriage, the Parties hereto had two (2) children, a male and an emancipated female. The son, ⸱                    , will be eighteen (18) years old on January 18, 2013 and he is a senior in high school.

D.     That the Parties met while both were serving in the West Virginia Legislature.

E.     That prior to their marriage, the Wife pled to and was adjudged guilty of a federal misdemeanor involving tax evasion.

F.     That upon conviction, the Wife was placed on two (2) years probation and she resigned her elected Legislative position.

G.     That prior to the Parties' marriage, the Husband had acquired 75% interest in his father's automobile dealership; and after marriage, circa 2005, the Husband sold the automobile dealership and purchased the marital home in Charleston, West Virginia, which was titled in both Parties' names. The mortgage associated therewith was retired by the proceeds of the sale of the Husband's separate automobile dealership.

H.     That the Court finds that for purposes of equitable distribution the parties hereto separated on December 1, 2010.

II.     INEQUITABLE CONDUCT

A.     That after his Legislative service, the Husband began working for then Governor Joe Manchin's office until approximately November 8, 2010.

B.     That the Husband was compelled by the nature of his work to come into daily

2

contact with one Donna L                ., a female co-worker in Governor Manchin's office.

C.      That for unknown or unconfirmed reasons, the Wife became extremely jealous of the Husband's working relationship with L              .

D.      That by her own testimony, the Wife became obsessed with L              ., and consequently, she made unreasonable demands and ultimatums to the Husband regarding L.

E.      That the Wife admits that she even engaged in destructive behavior and bizarre conduct towards the Husband over her perceived betrayal regarding L              , including "putting the hammer to" the Husband's wedding ring, selling his family's heirloom furnishings, writing Ms. L.              name on his bed sheets, writing L              name on a bathroom mirror and then breaking the mirror, and posting a composite photograph of L              and the Husband on Facebook.  See R. Ex. #10[1], sub-exhibits 3, 3A, 3B, and 3C and pp. 40 and 50-54.  The Wife also publicized in her 2010 Christmas cards and by an email to the Husband's cousin, the accusation of adultery coupled with allegations that the Husband and L. from their alleged illicit relationship. See R..Ex. #10, pp. 56-57 and R. Ex. #28, respectively, which was a source of humiliation to the Husband.  Lastly, without telling the Husband, the Wife secretly cancelled the Husband's airline ticket for a planned Thanksgiving vacation with the Parties and their two children.  As a result, the Husband could not go with his children on said vacation.

F.      That the Wife testified in Court and in her April 28, 2011 deposition that the only proof that she had of the Husband's adultery was

---

[1]Hereafter, all Exhibits shall appear as abbreviations, the key of which shall be Petitioner's Exhibit #x = P. Ex. #x; Respondent's Exhibit #y = R. Ex. #y; and Court's Exhibit #z = C. Ex. #z.

3

, the name of one Howard Y          . being found on the Husband's cell phone, and the

Husband's alleged admissions of a sexual relationship with Ms. L          . R. Ex.10, pp. 88-90.

4

G. That the Husband in Court and in his deposition denied not only any illicit relationship with Ms. L              , but also, any infidelity during his marriage to the Wife. P. Ex. #21.

H. That in her August 22, 2012 deposition, taken by the Wife, Donna L denied any adultery or sexual activity with the Husband.

I. That any divorce action in this State must be heard and determined independently of the admissions of the Parties, if any. *West Virginia Code* §48-5-402.

J. That even if the Husband had been proven to have committed adultery with L            , the Wife's own testimony indicates that she resumed a full conjugal relationship and general sexual relations with the Husband after knowledge of her belief of an affair between her Husband and L            ., thereby constituting condonation of any marital offense.

K. That the Wife filed for divorce on or about November 15, 2010, or about one week after the Husband left the Governor's office, alleging only no fault grounds in her Divorce Petition, which pleading contained no specific request for spousal support. The Husband denied irreconcilable differences in his December 15, 2010 responsive pleading to the Wife's Divorce Petition; and both Parties testified in Court that the Husband did not want the divorce.

L. That if alimony is an issue in a divorce case, the Court should compare the inequitable conduct of the Parties to determine which Party is more at fault for the dissolution of the marriage. *West Virginia Code* §48-8-104.

M. That the Family Court Judge finds no inequitable conduct on the part of the Husband, but the Family Court Judge finds substantial inequitable conduct on the part of the Wife that led to the dissolution of the Parties' marriage.

III. HUSBAND'S SEPARATE BANK STOCK

5

A.     That upon the evidence elicited and from a review of the Parties' financial disclosures heretofore lodged in the file of this case, the Family Court Judge finds that the Parties hereto have accumulated substantial real and personal marital and separate properties.

B.     That the Parties have stipulated that there are two blocks of stock of Heritage Bankshares, Inc., the holding company for First Exchange Bank of Mannington, West Virginia, (hereafter collectively referred to as the 'Bank') which are as follows: (a) 5,821 shares that are definitely marital in classification, but 2667 of those marital shares were assigned[2] to Husband at the price of $18.75 per share in order to accomplish an equitable distribution advance to the Husband in the amount of approximately $50,000.00; and (b) 40,565 shares the Husband had owned prior to the December 29, 1990 marriage to the Wife, or that Husband had received during the marriage as gifts or inheritance from his late father, James L. Pitrolo, Sr. There is an issue, treated more fully *infra.*, as to whether or not any increase in the value of these shares during the subject marriage, is active or passive appreciation, the former of which is distributable; however, the underlying 40,565 shares themselves are the separate property of the Husband, and they are hereby awarded to him.

## ACTIVE vs. PASSIVE APPRECIATION

B.     That the Husband has never been an employee of the Bank nor has he ever been involved in the management or the management's day to day operations of the Bank; however, he has served on the Bank Board of Directors since 1982, and he has held various Board committee positions during his tenure. The Bank Board meets approximately one time per month, and although the FDIC strongly recommends that the Bank Board members have a certain minimum

---

[2]See July 19, 2012 Order Regarding Reconsideration, entered July 20, 2012, Paragraph 5; 5821 *minus* 2667=3154 remaining marital shares that need to be divided in equitable distribution.

level of attendance, Husband's attendance record has been about 74%. P. Ex. #25.

C.      That at the time of the Parties' separation, the Husband was not the oldest serving Board member and he is not the Bank's largest shareholder.

D.      That according to William Goettel, the Bank's CEO,[3] as set forth in his deposition (R. Ex. #1), and in sworn testimony in open Court, the Bank is not closely held and said Bank, a state bank via its charter, is not publicly traded on the Wall Street exchanges unlike larger banks, such as BB&T.

E.      That Goettel testified although the Husband was not any more or any less active than any other Board member during his entire tenure, Goettel noted that since the Husband's aforesaid relocation to Charleston in 2005, the Husband had been less active than other Board members because of the distance between the Fairmont based Bank and the Husband's job site and residence in Charleston.

F.      That both Goettel and Adolph Niedermeyer, were qualified as experts. Goettel[4] was qualified as an expert in banking procedures and ESOPs, while Niedermeyer[5] was qualified as an expert in business administration and financial theory. Both men are Board members[6] of the Bank and both men have substantial stock holdings in the Bank.

G.      That Goettel was the Husband's witness, but, although also called by the Husband, Niedermeyer was originally named and called as the Wife's first witness.

H.      That both Goettel and the Wife's own witness, Niedermeyer, gave emphatic and

---

[3]Goettel has held this position since 1993. He is also the Trustee for the Bank's ESOP.

[4]Goettel was and is a CPA.

[5]Niedermeyer is a Ph.D. in Business Administration, who is a full professor at West Virginia University where he has taught for over thirty (30) years.

[6]Respective Board memberships are: Goettel for 19 years and Niedermeyer for 10 years.

7

unequivocal sworn testimony that any increase in the value of Bank stock for the period since their board membership began, was passive appreciation, in that, such increase or increases in share value were wholly attributable to either inflation or market conditions beyond the control of the individual Board members either singlely or collectively. Examples given were the Cease and Desist Order of the Office of the Comptroller (P. Ex. #18), troubled loans, economic downturns, or bad publicity.

I.     That Niedermeyer concurred with Goettel that no one Board member was more active than any other Board member, which conclusion and opinion, both witnesses specifically applied to the Husband, as well. Goettel also noted that stock splits at the Bank did not cause appreciation in the Bank's stock because every stockholder maintained the same relative percent of the Bank corporation that he or she had before the split.

J.     That finally, Goettel reported that there had been two (2) "outsider" sales of the Bank's stock in 2012 at the prices of $15.00 and $21.00 per share, respectively.

K.     That the Husband's long time accountant, Lonnie Rogers, CPA, who qualified as an expert in the field of accounting and taxation, testified that for a number of years, Husband's federal income tax returns, all of which had been signed by the Wife prior to separation, had listed the Husband's bank and bank stock income as "passive income". Rogers also testified that in the extended time of his service to the Husband, this listing of "passive income" on the Husband's returns had never been challenged by the IRS.

L.     That once the Husband's separate classification has been shown by the Husband in the subject Bank stock, the burden of proof is shifted to the Wife to show not only active appreciation in said holdings, but also, the amount of any active appreciation in the stock and the precise value of the active appreciation to be distributed. If no active appreciation is proven by

8

the Wife, then the inquiry into amounts of active appreciation and the value of the appreciation are not reached.

M. That the Wife's valuation experts, Dan Selby and David Epperly, appeared for the Wife in her case in chief. Selby argued that the Husband had been as active as any Board in the Bank and the Husband had been a member of the ten (10) person Board; and therefore, principally for these two (2) reasons, any increase in the Bank's shares during the Parties' marriage was due to active appreciation. Interestingly, Mr. Selby never interviewed any Bank executive, Bank employee, or any Board member, including his former instructor at WVU, Adolph Niedermeyer. Inspecting his November 9, 2012 Report, P. Ex. #1., Mr. Selby noted on Page 5 that his only source of evidence of active appreciation was the Wife. Although Mr. Selby testified in Court that he had also read the Goettel and the Husband's depositions, P. Ex. #21 and R. Ex. #1, it is not mentioned anywhere in his report.

N. That Mr. Epperly then was called by the Wife to place a value on the amount of active appreciation in the Bank stock during the marriage of the Parties. Relying upon an $18.75 value per share on December 31, 2011, and a December 31, 2011 "passive appreciation factor" published in the banking indices for major banks listed on the Wall Street exchanges, Mr. Epperly, through his chart appearing as sub-Exhibit "A" to P. Ex. #1, opined that the passive appreciation of the shares in various times during the marriage, subtracted from the stock control value of $18.75 on December 31, 2011, established the active appreciation, the cumulative value of which was $568,563.00. This sum was then to be divided by 2 to arrive at the Wife's distributive share thereof.

O. That there are some problems appearing from the Epperly analysis. Initially, the

9

Family Court Judge notes that the stock value of $18.75[7] used for active appreciation calculations by Epperly is based on the values on December 31, 2011, when the Parties separated on or about November 15, 2010, or over one (1) year earlier. Secondly, the passive appreciation factors are drawn from big (large capitalization) banks listed on the Wall Street exchanges, which are markedly dissimilar to the subject small Bank. Next, Mr. Epperly's aforesaid sub-Exhibit "A" presents something of a unacceptable paradox. Using Epperly's third column of "11/24/1997", the stock for that period increased in price from $4.93 to $18.75, or by $13.82; however, the Epperly model shows active appreciation of $15.39. How can there be distributable active appreciation that is $1.57 more than the actual or real single stock price increase. As a hypothetical result herein, 40,565 shares of the Bank multiplied by the $1.57 difference would be $63,687.05 more than was available to distribute from the reality of the collective stock value increase. Distilled to its crystalline essence, one conceivably could be called upon in equitable distribution to pay that which he did not have in actual dollars to pay.

P.    The Respondent argues that if the Court is inclined to find that the increase value of stocks is by active appreciation then the Court should adopt the formula outlined in *Decker v. Decker*, 17 Va. App. 12; 435 S.E.2d 407; 1993 Va. App. LEXIS 405; 10 Va. Law Rep. 203 (1993). If no one director out of the Bank's ten (10) Board of Directors was more active than any other director, then any stock increase in value by active appreciation should be divided by a factor of ten (10) to arrive at the sum of active appreciation to be distributed. *Id.* Epperly's sub-Exhibit "A" should then have been $568,563/10 = $56,856.30/2 = $28,428.15.

Q.    That even if active appreciation were proven, valuation of any stock

---

[7]The Court notes that this stock value was comparable to that appearing in the December 8, 2010 and February 14, 2011 Southard Stock Valuation Estimates. See Ct. Ex. #s 1 and 2.

10

increase in a non-publicly traded bank where all director's are equally active, should not be assigned to only one director in equitable distribution incidental to a divorce action, but rather in a ratio to the Board as a whole. *Id.*

R. That mere service on a board of multiple directors of a company, standing alone, without more, such as full time work activity for the company, is insufficient to establish active appreciation. See *Smith v. Smith*, 197 W.Va. 505, 475 S.E. 2d 881 (1996).

S. That in view of the foregoing, including the testimony of her own witness Dr. Niedermeyer, Messrs. Selby and Epperly's November 9, 2012 report, P. Ex. #1, is hereby rejected, and consequently, the Wife has failed to meet her burden of proof that any increase in the value of the Bank's stock during the Parties' marriage, was attributable to active appreciation. Thus, the inquiry ends there, and valuation of the increase in value of the Husband's separately owned Bank stock during the marriage becomes irrelevant.

## IV. FEBRUARY 18, 2010 POSTNUPTIAL AGREEMENT:

A That by his December 6, 2012 in-Court testimony and through his April 13, 2012 Reply to Wife's March 22, 2012 Requests for Admission, Husband admitted the authenticity of the copy of the February 18, 2010 Postnuptial Agreement (P. Ex. #32), which was drafted by the Wife. In his aforesaid Reply, the Husband affirmatively averred that, by the mutual agreement of the Parties, said Agreement was repudiated by both Parties after the Wife informed the Husband that she had taken the original from the jointly held safety deposit box and the copy from the firebox hidden by her in the former marital home, and destroyed said original Postnuptial Agreement, along with all copies thereof, all of which was a result of her initiative. In essence, the Parties mutually agreed by the aforesaid acts of the Wife, that said Agreement was no longer

11

valid. Except for the drafting of the subject document, the Wife refuted the forgoing testimony of the Husband in its entirety. Worthy of particular note is the fact that the Wife, by her own sworn testimony, had control of *both duplicate originals* of the alleged Postnuptial Agreement for some time prior to the Wife's filing for divorce.

B. That according to the Husband, he was led to believe that the Wife had destroyed said Agreement and copies thereof because she thought it limited her claim to Husband's separate Heritage Bancshares stock, and Wife's reconsidered position that said Agreement unfairly did not provide for her children by a previous marriage. Again, Wife refuted the forgoing testimony of the Husband in its entirety.

C. The aforesaid Agreement only addressed the ability to sell or otherwise transfer these shares. Said Agreement allows the Husband to enjoy income from the Bank shares during his life, but without the ability to sell said stock unilaterally. In essence, the purported Agreement, demonstrates that not the stock ownership, but rather the income generated by the Bank dividends is joint income. The alleged Agreement is merely an abbreviated and limited estate plan, that awards ownership of all of the Bank shares to the Parties' children. Further, said Agreement proves that neither title nor possession of Husband's Bank shares was to be transferred to Wife. Obviously, under the newly surfaced Agreement, apparently discarded, the Husband's Bank stock was to remain in the Pitrolo family, to go, upon Husband's death, to the Parties' children alone.

D. That Wife's actual repudiation of said Agreement is evidenced by the following subsequent acts of the Wife which are inconsistent with her intent to honor and be bound by the same; or, in the alternative, *prima facie* proof of her subsequent violation of the same:

a. The said February 18, 2010 Agreement was never consummated by

12

the transfer of title or the creation of jointly titled Bank stock certificates, which would require the signature of the Wife prior to the disposal or the alienation of the same;

b. That the Husband, with the knowledge of the Wife, but without the "dual signature" of the Wife, transferred 400 shares of said Bank stock to each of the Parties' two children on or about March 3, 2010;

c. ·That the Wife, by her own in-Court testimony, her April 28, 2011 deposition testimony (R. Ex. #10), and her answers to prior discovery herein, has, in contravention of said February 18, 2010 Agreement, (i) created and continued joint accounts with third parties using marital monies (R. Ex. #12); (ii) maintained business accounts to which Husband had no access; (iii) surreptitiously closed and converted joint marital accounts, the most recent of which (April 4, 2012; see R. Ex. #13) was the appropriation of a checking and a savings account at the First Exchange Bank during Husband's vacation with the Parties' son during his Spring Break; (iv) the Wife's hiding a fireproof safety box within the marital home; and, (v) heretofore concealed the existence of said Agreement, because she was "embarrassed to admit" that she had "lost" the original Agreement, and then argued that the subject Bank stock or some portion thereof was marital, not because of the previously unmentioned and undisclosed Agreement document

13

(which was never touched upon by Wife's counsel in any discovery requests or at the Husband's April 27, 2011 deposition), but because said Bank stock had been actively appreciated. In short, Wife's testimony on this latter point, D., c., (v.), is simply not believable, and, in fact, patently incredible. Moreover, it would appear that Wife's "eleventh hour"[8] attempt to enforce an the alleged Postnuptial Agreement, is inconsistent with her position on the active appreciation of the subject Bank stock, addressed more fully, *supra.*

E.       That there was a failure of consideration of, and a fraud in the inducement for entering into, said Agreement for another more nearly obvious reason. The Wife had left the marital domicile in the beginning of 2010, and then she resumed martial relations in February 2010 for unexplained reasons. Yet, the Husband testified that the Wife had stated that she would only reconcile and remain in the Parties' marriage *if* he executed the subject Agreement which she drafted. That neither party sought the advice of an attorney before entering into said Agreement. The Husband's testimony on this point is more believable than the Wife's evidence on this point.

F.       That postnuptial agreements are to be scrutinized more closely than prenuptial contracts because in the latter, a party to whom an agreement is presented, may still walk away from the marital union; while the former, within the confines of a long term, existing marriage, can be motivated by considerations that override voluntariness and fairness, such as loss of

---

[8]This divorce was commenced by the Wife on November 15, 2010, however, the February 18, 2010 Postnuptial Agreement was not even spoken of by her until her *March 22, 2012* discovery Requests for Admission, or some sixteen (16) months after the filing of the divorce, and nearly one year after her April 28, 2011 deposition.

14

property, parenting time, reputation, standard of living, spousal support, or just the prospect of loneliness in an aged spouse. *Bedrock v. Bedrock*, 300 Conn. 691, 703; 17 A.3d 17, 19; 2011 Conn. LEXIS 141; 77 A.L.R.6th 765 (2011). *Cf. Welsh v. Welsh*, 136 W.Va. 914; 69 S.E.2d 34; 1952 W.Va. LEXIS 14 (1952).

G.   That the February 18, 2010 Postnuptial Agreement, P. Ex. #32, is invalid, void and unenforceable due to the same having been repudiated by the Parties by their express statements and their subsequent acts inconsistent with an intention to be bound by said Agreement, and that the execution of the said Agreement was obtained by duress and/or fraud in the inducement therefore was not entered into voluntarily.

H.   That the burden of establishing the validity of an agreement between spouses is on the party seeking enforcement of the agreement. *Preece v. Preece*, 195 W.Va. 460, 465 S.E.2d 917 (1995). Wife has failed to carry her burden of proof in that regard.

## V.   EQUITABLE DISTRIBUTION (*Conrad*[9] Credits, and Miscellaneous Matters)

The parties hereto have a significant marital estate that shall be divided as follows:

### A. *PREMARITAL PROPERTY:*

That the Husband owned a 1949 Chevrolet automobile, 50% interest in a rental real property in Mannington, West Virginia, and an unimproved lot in Mannington, West Virginia, which are his separate properties, and the same are hereby awarded to him. The values of these items are irrelevant given that they are the Husband's premarital property.

### B. *REAL ESTATE:*

---

[9]*Conrad v. Conrad*, 216 W.Va. 696, 612 S.E.2d 772 (2005), which basically overruled or at least superceded the older ruling from *Kapfer v. Kapfer*, 187 W.Va. 396, 419 S.E.2d 464 (1992), that in a divorce case, the paying party of marital debt, after separation but before final decree, only received credits for a reduction in principal of such debt. See also *Jordan v. Jordan*, 192 W.Va. 377, 452 S.E.2d 468 (1994).

15

That the parties' marital home is located at            , Charleston, West Virginia was valued by the Wife at $190,500 based upon a February 28, 2005 appraisal by one Timothy W. Helmick at the time of the Parties' 2005 purchase of said residence. See P. Ex. #49. Husband contends that the marital home is worth at least $200,000 or $9,500 greater because there had been substantial improvements to the marital home since 2005 in the approximate amount of $22,000.00. That based upon the testimony of the parties, the Court hereby values the former marital home at $200,000.00.

There is no mortgage on the marital home and the Wife has made known her desire to have the same consigned to her in equitable distribution. Therefore, this Court finds that the Petitioner shall retain as her sole and separate property, the parties' former marital home.

C. *HOUSEHOLD ITEMS:*

The Petitioner shall retain the marital household items located at the former marital home. The Court finds that neither party presented evidence nor assigned a value to the marital household items on his/her respective financial statements. Therefore, the Petitioner shall not be attributed any value for these items.

D. *CONRAD CREDITS:*

1. That the Wife has exclusively occupied the former marital home, together with the furnishings therein contained, since December 1, 2010, up to the dates of this Final Hearing, and presumably for the remainder of December 2012, or twenty-five (25) months, while the Husband had to expend post separation monies for independent living quarters and furnishings. The Wife's exclusive occupation of the marital home and exclusive use of the marital furnishings was initially by agreement of the Parties, and then

16

by the force of the March 17, 2011 Temporary Order of this Court.

2. That the unrefuted evidence of Husband's expert, Cindy Walton, was that the aforesaid marital home at ⸴, Charleston, West Virginia, had a monthly rental value of $1,500.00 per month for the time span from the Parties' separation until December 31, 2012. See R. Ex. #2. That multiplying the aforesaid rental rate of $1,500.00 per month times the 25 months that the Wife has been in the exclusive possession of the former marital home gives a product of $37,500.00 in total rental value for the stated period. Because Husband was deprived of his proprietary one-half interest for the same period, Husband is entitled to a distributive credit in the amount of ($37,500/2=) $18,750.00.

3. That the Husband is entitled to 50% of the following additional distributive credits for interim service of marital debt:

    a.    Item #3, checks #s 1874 ($502.04) and #1796 ($390.58) of R. Ex. #23 or ($892.62/2) = $446.31;

    b.    Item #5, Washer/Dryer in Marital Home of R. Ex. #23 or ($685/2) = $342.50;

    c.    Item #6, Wells Fargo Furniture in Marital Home of R. Ex. #23 or ($750/2) = $375.00;

    d.    Home Equity Loan, per R. Ex. #21, plus payments through September 1, 2013 payment of $246.18 or ($8,218.71/2)=$4,109.36;

    e.    The 2012 West Virginia State taxes to be paid by Husband in the amount of $4,188.00 that has been incurred by the Court ordered distribution of the Erie Annuity to the Wife. See R. Ex. #6, #7 and #27;

17

f.   The unpaid tax preparation charges for the Parties' 2010 returns in the

amount of $300.00 (R. Ex. #26), and;

The total credit due Husband for paragraphs a-f above is $9,761.17.

E. UNCHARACTERIZED SUPPORT:

The Court finds that in its prior Corrected Final Order that it mistakenly left out

the characterization of the support paid by the Husband to Wife after the Wife began

receiving Social Security payments on behalf of the minor child in October 2011.

Therefore, the Court finds that the sum of $9,765.00 shall be credited to the Wife and

characterized as an advance of equitable distribution.

F. *INVESTMENT/RETIREMENT ACCOUNTS:*

1. Edward Jones IRA (#              ):  The Court finds that this

account is a marital account valued at $252,681.86 which represents $323,262.86 *minus*

the Husband's premarital funds in the amount of $70,851.00. The Court finds further that

this account encompasses several mutual funds previously listed in the Corrected Final

Order (paragraphs 17-24) which shall be included in this account rather than as separate

accounts in addition to this parent account. The Court finds that for equitable distribution

purposes this account shall be designated to the Husband.

2. Edward Jones IRA (              ):  The Court finds that this account is a

marital account valued at $46,285.13. The Court finds that this marital account holds

accounts for both Husband and Wife. Specifically, Wife has two IRA accounts within this

account the first valued at $4,223.23 and the second valued at $1,082.43 and she shall

receive as her sole and separate property those two IRAs valued at 5,305.66. Husband

shall retain the remainder of that account in the amount of $40,979.47 as his sole and

18

separate property. This division is outlined on the Exhibit A attached hereto.

3. BB&T Checking # ___ : The Court finds that this checking account is a marital account and was valued at $315.90 as of the date of separation. The Court finds that for equitable distribution purposes this account shall be designated to the Wife.

4. BB&T Savings # ___ : The Court finds that this savings account is a marital account and was valued at $100.55 as of the date of separation. The Court finds that for equitable distribution purposes this account shall be designated to the Husband.

5. BB&T Checking # ___ : The Court finds that this checking account is a marital account designated for the use of Bradley Strategies and was valued at $2,303.00 as of the date of separation. The Court finds that for equitable distribution purposes this account shall be designated to the Wife.

6. Chase # ___ : The Court finds that this checking account is a marital account and was valued at $1,506.77 as of the date of separation. The Court finds that for equitable distribution purposes this account shall be designated to the Husband.

7. Chase MM # ___ : The Court finds that this money market account is a marital account and was valued at $8,000.29 as of the date of separation. The Court finds that for equitable distribution purposes this account shall be designated to the Husband.

8. First Exchange Bank # ___ : The Court finds that this checking account is a marital account and was valued at $754.39 as of the date of separation. The Court finds that for equitable distribution purposes this account shall be designated to

19

the Husband.

9. First Exchange Bank MM # ,   The Court finds that this money market account is a marital account and was valued at $1,354.09 as of the date of separation. The Court finds that for equitable distribution purposes this account shall be designated to the Husband.

10. First Exchange Bank MM #   ,: The Court finds that this account is a marital account and was valued at $141.67 as of the date of separation. The Court finds that for equitable distribution purposes this account shall be designated to the Husband.

11. First Exchange Bank MM #   : The Court finds that this account is a marital account and was valued at $612.53 as of the date of separation. The Court finds that for equitable distribution purposes this account shall be designated to the Husband.

12. United Bank #   The Court finds that this account is a marital account and was valued at $2,936.03 as of the date of separation. The Court finds that for equitable distribution purposes this account shall be designated to the Wife.

13. United Bank #   : The Court finds that this account is a marital account and was valued at $13,930.22 as of the date of separation. The Court finds that for equitable distribution purposes this account shall be designated to the Wife.

14. ING Deferred Comp: The Court finds that this account is a marital account and was valued at $7,658.00 as of the date of separation. The Court finds that for equitable distribution purposes this account shall be designated to the Husband.

15. Prudential: The Court finds that this account is a marital account and

20

was valued at $2,567.73 as of the date of separation. The Court finds that for equitable distribution purposes this account shall be designated to the Husband.

16. Roth IRA: The Court finds that this account is a marital account and was valued at $8,541.68 as of the date of separation. The Court finds that for equitable distribution purposes this account shall be designated to the Husband.

16. TIAA Cref: The Court finds that this account is a marital account and was valued at $8,057.00 as of the date of separation. The Court finds that for equitable distribution purposes this account shall be designated to the Wife.

17. Public Employee Retirement: The Court finds that this account is a marital account and was valued at $4,100.00 as of the date of separation. The Court finds that for equitable distribution purposes this account shall be designated to the Wife.

18. Public Employee Retirement: The Court finds that this account is a marital account and was valued at $22,431.53 as of the date of separation. The Court finds that for equitable distribution purposes this account shall be designated to the Husband.

F. *VEHICLES*

1. 2006 Toyota: The Court finds that the 2006 Toyota vehicle is a marital vehicle. The Court finds that the value of the vehicle is $11,800.00. The Court finds that for equitable distribution purposes this account shall be designated to the Wife.

2. 2009 Chrysler Sebring: The Court finds that the 2009 Chrysler Sebring vehicle is a marital vehicle. The Court finds that the value of the vehicle is $18,600.00. The Court finds that for equitable distribution purposes this account shall be designated to

21

the Husband.

### G. *HERITAGE BANK SHARES*

1. That the Parties have stipulated that there are two blocks of stock of Heritage Bankshares, Inc., the holding company for First Exchange Bank of Mannington, West Virginia, (hereafter collectively referred to as the 'Bank') which are as follows: (a) 5,821 shares that are definitely marital in classification, but 2667 of those marital shares were assigned to Husband at the price of $18.75 per share in order to accomplish an equitable distribution advance to the Husband in the amount of approximately $50,000.00; (b) 40,565 shares the Husband had owned prior to the December 29, 1990 marriage to the Wife, or that Husband had received during the marriage as gifts or inheritance from his late father, James L. Pitrolo, Sr; and, (c) the marital shares were 5,821 *minus* Husband's advance of equitable distribution in the amount of 2,667 that leaves 3,154 remaining marital shares to be divided by the Court. That the Petitioner and Respondent shall share equally in the 3,154 marital shares with the Petitioner receiving 1,577 shares and the Respondent receiving 1,577 shares. Respondent shall also retain the 40,565 shares that were premarital and the separate property of the Respondent.

### H. *MISCELLANEOUS PROPERTY*

1. BB&T Investors Deposit Account #      ; The Court finds that this account was a marital account valued at $10,304.13; however, that was closed in August 2010 with $2,500 deposited in the parties' primary checking account and therefore has been addressed in equitable distribution of the bank account. However, the remaining $7,804.13 was disbursed to an unknown source and the Court was not provided documentation regarding the disbursement. Based upon *Roig v. Roig*, 178 W.Va. 781,

22

364 S.E.2d 794 (1987), this Court find that when the issue in a divorce proceeding is the equitable distribution of marital property, both parties have the burden of presenting competent evidence to the trial court concerning the value of such property. Additionally, the Supreme Court noted in a memorandum decision in *Smailes v. Smailes*, No. 12-0155:

> "that neither party provided sufficient evidence on the value of their marital properties, the value of their respective pre-marital properties, or on the amount of marital money spent to improve and/or maintain their respective pre-marital properties. Based upon the dearth of evidence provided by the parties, the family court did its best to make an equitable distribution."

Therefore, the Court finds that the $7,804.13 is uncharacterized because the Court was not provided with any competent evidence by either party.

2. Bradley Strategies: The Court finds that in the Respondent's proposed equitable distribution sheet, the Petitioner was attributed $35,000.00 for value of her marital business. The Court finds that although the business was marital and testimony supported that she earned $35,000.00 during the last year of operations of the firm, that the Petitioner suspended operations and is employed elsewhere at the time of the hearing, therefore the Court assigns it no value.

3. Husband's wedding ring: The Court finds that per the testimony of the Wife the Husband's wedding ring valued at $1,195.00 was destroyed by the Wife. Therefore, the Court finds that this amount shall be deducted from the Wife's funds from equitable distribution.

4. First Exchange Bank closeout: The Court also heard testimony regarding the Wife's post-separation closure of the Husband's account at First Exchange Bank in the amount of $2,209.83. The Husband shall be reimbursed the entire sum of $2,209.83 from

23

any funds received by the Wife.

I. *MARITAL DEBT*

1. BB&T Home Equity: The Court finds that as of the date of separation the marital debt was $16,054.53 and the Husband shall be responsible for payment of this debt and hold the Wife forever harmless for the same. Neither party shall increase or encumber the former marital home further on this account and Husband shall make consistent and timely payments on that account until it is satisfied in full.

2. Discover: The Court finds that as of the date of separation the marital debt was $301.39 and the Wife shall be responsible for payment of this debt and hold the Husband forever harmless for the same.

3. Goodyear Visa: The Court finds that as of the date of separation the marital debt was $351.36 and the Wife shall be responsible for payment of this debt and hold the Husband forever harmless for the same.

4. Home Depot: The Court finds that as of the date of separation the marital debt was $307.50 and the Wife shall be responsible for payment of this debt and hold the Husband forever harmless for the same.

5. JC Penney: The Court finds that as of the date of separation the marital debt was $57.21 and the Wife shall be responsible for payment of this debt and hold the Husband forever harmless for the same.

6. First Card: The Court finds that as of the date of separation the marital debt was $612.01 and the Husband shall be responsible for payment of this debt and hold the Wife forever harmless for the same.

7. Lowes: The Court finds that as of the date of separation the marital debt was

24

$393.67 and the Wife shall be responsible for payment of this debt and hold the Husband forever harmless for the same.

## J. *SUMMARY OF EQUITABLE DISTRIBUTION*

The Court finds after review of the above that the marital estate shall be divided as outlined above. Based upon the foregoing, in order to equalize the marital estate, the Husband shall pay the Wife the sum of $38,100.03 (See, Exhibit A attached hereto) *less* reimbursement to the Husband for his wedding ring in the amount of $1,195.00; his post-separation account in the amount of $2,209.83; Wife's receipt of the remainder of funds from escrow account of $5,183.29 (*$8,351.29 less check to Husband in the amount of $3,165 for Erie Annuity taxes*); Wife's advance on equitable distribution in Section I above in the amount of $9,765.00; Husband's credit for *Conrad* credits in Section D in the amount of $9,761.17; and, Husband's credit for rental expense of the former marital home in Section D, Paragraph #2 in the amount of $18,750.00. Therefore, the Wife shall pay the Husband the total sum of $8,764.26.

In order to effectuate equitable distribution to the Husband, the Husband shall receive an inequitable portion of the 3,154 marital bank stock shares. Specifically, the Husband shall receive an additional 467 of the marital bank stock shares valued at $8,756.25[10] to equalize equitable distribution. The Court finds that the Husband testified on the record that he would waive a nominal amount owed to him if necessary. Therefore, the Husband shall receive 2,044[11] of the marital bank stock shares and the Wife shall receive a total of 1,110[12] marital bank shares.

---

[10] 467 shares x $18.75 /share = $8,756.25
[11] 3,154 shares/2 = 1,577 + 467 = 2,044 shares
[12] 3,154 shares/2 = 1,577 - 467 = 1,110 shares

25

## VI. ALIMONY

A. That the Wife has a college education, substantial job experience and a formidable resume (P. Ex. #35);

B. That the Wife was terminated or fired from her job with the City of Charleston on December 7, 2011, regarding embezzlement by an employee under her supervision; and she was proffered but did not take additional compensation of $6000 associated therewith (R. Ex. #15);

C. That the Wife received substantial advance equitable distributions, noted in Section V., Paragraph L., hereinabove; and she wants, and will receive under the distribution hereinafter Ordered, a $200,000.00 home with no mortgage (save the Equity Line), and a late model automobile with no car payment;

D. That the Wife is teaching full time at Capital High School (P. Ex.#33 and #37), and she has PEIA health insurance coverage incidental to her employment;

E. That the Wife, by her testimony, enjoys good health at 61 years of age;

F. That the Wife has her own company, namely Bradley Strategies, LLC, which though not presently active, has not been dissolved and said company was profitable prior to 2012. It is also worthy of note that the Wife did not pursue regaining customers or new contracts for said company with the same zeal as the number of resumes she transmitted for seeking new jobs (see P. Ex. #34) for her as an individual;

G. That the Wife received a 2011 tax refund in the amount of $7,474.00 (R.Ex.#11);

H. That the Wife received unemployment compensation during the interim after her December 7, 2011 firing from the City of Charleston;

I. That under equitable distribution plan the Wife will receive substantial Bank stock dividends from approximately 2803 shares;

26

J. That the Wife was guilty of greater inequitable conduct than the Husband, as described in Section II. hereinabove, including her wanting the divorce;

K. That the Wife's need is not greater than her economic resources to meet that need, when the daughter's financial considerations are removed;

L. That the Wife's financial need, if any, is of no moment when the Court considers her recent inheritance of more than $20,000.00 and her 2011 liquidated IRA (P. Ex. #38 and #39). *West Virginia Code* §48-6-301.

M. That the Husband has the ability to pay spousal support from his recurring income; however, the Husband will have substantial tax liability that the Wife will not. R. Ex. #5 and #6.

N. That upon consideration of the foregoing, the Wife is not entitled to permanent spousal support, nor is the Wife a candidate for rehabilitative alimony, in that, since the Wife is 61 years of age, the latter is not suited for an older former spouse. *Wooten v. Wooten*, 203 W.Va. 686, 510 S.E.2d 760 (1998).

VII. ALL OTHER ISSUES ON RECONSIDERATION

1. The Wife's allegation that she never received her $50,000 advance on equitable distribution previously ordered by Judge Snyder is entirely false. Specifically, the Wife received the sum of $35,335 from the Erie Annuity as well as an entire IRS refund in the amount of $14,665 which totaled $50,000.00. Therefore, this issue is moot and has been resolved outside of the scope of the Court's Final Order.

2. The Court finds that the majority of the Wife's assertions contained in her Motion for Reconsideration is not supported by *West Virginia Code* §51-2A-10 and is in regard to factual findings made by the Court in its Corrected Final Order not alleging any mistake, fraud or other

27

· error.

## VIII. CHILD SUPPORT

A.      That the inclusions for gross income to be used in the calculation of child support is governed by *West Virginia Code* §48-1-228.

B.      That child support should utilize the Wife's gross income from her pay stubs (P. Ex #33) the Husband's November 2012 pay stubs from a tendered unmarked exhibit attached hereto, one-half (½) of the health insurance premium of $273.00 per month paid by the Husband for him and the son,     , the Social Security payments for the son,       ,lich is attributed to the Husband[13] (R. Ex. #14), the 2011 distributed amount, appearing in Box D of Part III of the Husband's K-1 (R. Ex. #18) for 2011. See Exhibit "B" attached hereto and incorporated by and for reference.

C.      Upon calculation per statute, child support, effective January 1, 2013 and terminating on May 31, 2013 (when said infant graduates from high school since he turns 18 years old on January 18, 2013), payable from the Husband to the Wife, in the amount of Zero Dollars and Zero Cents ($0.00) per month upon the first of each month.  See child support calculation attached hereto as Exhibit "B".

## IX. ATTORNEYS' FEES

A.      That when determining whether or not to award attorney's fees, the Court

---

[13] § 48-13-603. Adjustment for obligor's social security benefits sent directly to the child; receipt by child of supplemental security income.
(a) If a proportion of the obligor's social security benefit is paid directly to the custodian of his or her dependents who are the subject of the child support order, the following adjustment shall be made. The total amount of the social security benefit which includes the amounts paid to the obligor and the obligee shall be counted as gross income to the obligor. In turn, the child support order will be calculated as described in sections 13-401 [§ 48-13-401] through 13-404 [§ 48-13-404]. To arrive at the final child support amount, however, the amount of the social security benefits sent directly to the child's household will be subtracted from the child support order. If the child support order amount results in a negative amount it shall be set at zero.

28

should consider a wide range of factors including the party's ability to pay his or her own fees, the beneficial result obtained by the attorney, the parties' standard of living, the degree of fault of either party making the divorce action necessary and the reasonableness of the attorney fees request. *Banker v. Banker*, 196 W.Va. 535, 474 S.E.2d 465 (1996); *Landis v. Landis*, 223 W.Va. 325, 74 S.E.2d 186 (2007);

B.     That based upon the same considerations employed in the alimony analysis in Paragraph VI. (A.-N) above, as well as the considerations of *Banker* and *Landis*, neither party is entitled to an awarded attorney fees.

## CONCLUSIONS OF LAW

A.     That the burden of proof on the issue of increase in value on separate property is upon the party claiming active appreciation[14];

B.     That under prevailing West Virginia law[15], active appreciation of a separate asset during a marriage causes the increase in the value of said asset to be marital—it does not convert the underlying separate asset into a marital asset, thereby permitting the in-kind equitable distribution suggested by Wife's November 9, 2012 report, authored by Selby and Epperly (P. Ex. #1). Therefore, only the increase in value during the marriage is distributable, *not* the separate stock upon which the increase is based[16];

C.     That the long known and uncontroverted facts are that the Husband has never been a full time employee of Heritage Bankshares, Inc., or the First Exchange Bank, and that the Husband has never been a member of either institution's KSOPs, as erroneously cited by the

---

[14]*Mayhew v. Mayhew*, 205 W.Va. 490, 519 S.E.2d 188 (1999). (*Mayhew II*).
[15]*Mayhew v. Mayhew*, 197 W.Va. 290, 475 S.E.2d 382 (1996). (*Mayhew I*).
[16]*Id.* at 392.

29

Wife's expert(s)[17] on Pages 4-5, of their November 9, 2012 report (P. Ex. #1);

      D.     That the Court is not free to disregard arbitrarily unrefuted expert testimony. *Bettinger v. Bettinger*, 183 W.Va. 528, 396 S.E.2d 709 (1990); *Langevin v. Langevin*, 187 W.Va. 585, 420 S.E.2d 576 (1992); *Coit v. Meadows*, 202 W.Va. 327, 504 S.E.2d 154 (1998). Thus, the credible in-Court testimony of the expert Cynthia J. Walton is dispositive on the issue of the rental value of the former marital home, in that, the same was not controverted or refuted by the Wife;

      E.     That there is a marked preference for characterizing property acquired during a marriage as marital property: *Whiting v. Whiting*, 183 W.Va. 451, 396 S.E.2d 413 (1990); *Staton v. Staton*, 218 W.Va. 201, 624 S.E.2d 548 (2005);

      F.     That a Court should evenly divide, or transfer in kind, any stock purchased during the marriage, if the transfer would not jeopardize the value of the business entity. In this case, the Bank stock that is the subject of the active appreciation arguments of the Wife were either purchased prior to marriage, were gifts or were inherited by the Husband. Therefore, *Arneault v. Arneault*, 219 W.Va. 628, 639 S.E.2d 720 (2006), does not apply;

      G.     That the Court normally may consider only the recurring income of the Parties in determining whether to award, modify, increase, reduce or terminate an alimony or spousal support obligation; however, upon specific findings, the Court may invade the corpus of the separate property of a Party to give effect to an alimony award. See *West Virginia Code* §§ 48-5-510(b) and 48-6-301(b)(3). Those considerations are not present in the case *sub judice*;

      H.     That the office of spousal support is not to equalize income between the Parties. *Stone v. Stone*, 200 W.Va. 15, 488 S.E.2d 15 (1997);

---

[17]Indeed, upon inquiry in cross examination of Selby and Epperly, no Bank director or officer has been approached or

I.      That in the absence of a valid agreement, *West Virginia Code* §48-6-301 lists

twenty (20) factors to be considered and to otherwise serve as guidelines in awarding spousal

support;[18]

J.      That the length of time the Parties were married and the length of time the Parties

lived together are factors to be considered in determining an award of spousal support. In this

case, the Parties had been married for nearly twenty (20) years. *West Virginia Code* §48-6-

---

interviewed by the Wife's expert(s) at any time since September 10, 2012.

[18] § 48-6-301. Factors considered in awarding spousal support, child support or separate maintenance.

(a) In cases where the parties to an action commenced under the provisions of this article have not executed a separation agreement, or have executed an agreement which is incomplete or insufficient to resolve the outstanding issues between the parties, or where the court finds the separation agreement of the parties not to be fair and reasonable or clear and unambiguous, the court shall proceed to resolve the issues outstanding between the parties.

(b) The court shall consider the following factors in determining the amount of spousal support, child support or separate maintenance, if any, to be ordered under the provisions of parts 5 and 6, article five [§§ 48-5-501 through 48-5-514 and §§ 48-6-101 through 48-5-613] of this chapter, as a supplement to or in lieu of the separation agreement:

(1) The length of time the parties were married;

(2) The period of time during the marriage when the parties actually lived together as husband and wife;

(3) The present employment income and other recurring earnings of each party from any source;

(4) The income-earning abilities of each of the parties, based upon such factors as educational background, training, employment skills, work experience, length of absence from the job market and custodial responsibilities for children;

(5) The distribution of marital property to be made under the terms of a separation agreement or by the court under the provisions of article seven of this chapter, insofar as the distribution affects or will affect the earnings of the parties and their ability to pay or their need to receive spousal support, child support or separate maintenance: Provided, That for the purposes of determining a spouse's ability to pay spousal support, the court may not consider the income generated by property allocated to the payor spouse in connection with the division of marital property unless the court makes specific findings that a failure to consider income from the allocated property would result in substantial inequity;

(6) The ages and the physical, mental and emotional condition of each party;

(7) The educational qualifications of each party;

(8) Whether either party has foregone or postponed economic, education or employment opportunities during the course of the marriage;

(9) The standard of living established during the marriage;

(10) The likelihood that the party seeking spousal support, child support or separate maintenance can substantially increase his or her income-earning abilities within a reasonable time by acquiring additional education or training;

(11) Any financial or other contribution made by either party to the education, training, vocational skills, career or earning capacity of the other party;

(12) The anticipated expense of obtaining the education and training described in subdivision (10) above;

(13) The costs of educating minor children;

(14) The costs of providing health care for each of the parties and their minor children;

(15) The tax consequences to each party;

(16) The extent to which it would be inappropriate for a party, because said party will be the custodian of a minor child or children, to seek employment outside the home;

(17) The financial need of each party;

(18) The legal obligations of each party to support himself or herself and to support any other person;

(19) Costs and care associated with a minor or adult child's physical or mental disabilities; and

(20) Such other factors as the court deems necessary or appropriate to consider in order to arrive at a fair and equitable grant of spousal support, child support or separate maintenance.

2001, c. 91.

31

301(b)(1) and (2);

K.     That the Wife has ample recurring monthly income and additional financial ability and resources from her separate property to meet her (as opposed to her daughter's) ordinary and necessary monthly expenses. *West Virginia Code* §48-6-301(b)(3);

L.     That in determining an award of spousal support, the Court shall consider misconduct of the Parties as it relates to the deteriorating factors of the marriage. *West Virginia Code* §48-8-104. In this case, the Court finds and concludes that the Wife engaged in substantial inequitable conduct, as detailed in Section II. hereinabove. The Wife should not be awarded any spousal support;

M.     That the Court must classify, value and distribute marital property, and as part of its disposition, the Court may order marital property transferred from one spouse to another, or the Court may order marital property sold. *West Virginia Code* §48-7-104;

N.     That if a party has converted, disposed of, or not accounted for a marital asset of the value of $500.00 or greater within five (5) years of the Parties' separation, such dissipated marital asset may be considered in equitable distribution. *West Virginia Code* §48-7-206(3);

O.     That when determining whether or not to award attorney's fees, the Court should consider a wide range of factors including the party's ability to pay his or her own fees, the beneficial result obtained by the attorney, the parties' standard of living, the degree of fault of either party making the divorce action necessary and the reasonableness of the attorney fees request. *Banker v. Banker*, 196 W.Va. 535, 474 S.E.2d 465 (1996); *Landis v. Landis*, 223 W.Va. 325, 74 S.E.2d 186 (2007);

P.     That except for the property consignments and distributions treated herein, each Party shall be released from any and all claims of the other arising out of, because of or on

32

account of the marriage heretofore celebrated between them, and dissolved on or about September 10, 2012; i.e., each Party should be barred from any and all other claims he or she may or could have raised or asserted against the other, but did not advance, in these proceedings; and,

Q. That each of the Parties hereto should be enjoined, restrained and prevented from going about, molesting or bothering the other Party at his or her home, residence, place of employment, in public, or elsewhere, which proscription applies not only to the Parties hereto, but to his or her family members, agents, servants, or employees.

## FINAL ORDER

It is therefore ORDERED and ADJUDGED that the equitable distribution of the marital property identified and classified hereinabove, shall be awarded to and from each Party in accordance with the Court's Findings of Facts, which said relief and distributions are hereby ratified, confirmed, approved and adopted by the Court, as if set forth *verbatim* hereat.

It is further ORDERED and ADJUDGED that the Wife is not entitled to an award of spousal support from the Husband; and the Husband did not seek spousal support.

It is further ORDERED and ADJUDGED that child support shall be awarded consistent with the factors set forth in Section VII. hereinabove, and as specified in the attached child support calculation.

It is further ORDERED and ADJUDGED that neither Party is entitled to an award of attorney fees.

It is further ORDERED and ADJUDGED that except for the property consignments and distributions treated herein, each Party shall be released from any and all claims of the other

33

arising out of, because of or on account of the marriage heretofore celebrated between them, and dissolved on September 27, 2012; i.e., each Party shall be barred from any and all other claims he or she may or could have raised or asserted against the other, but did not advance, in these proceedings.

It is further **ORDERED** and **ADJUDGED** that each of the Parties hereto shall be enjoined, restrained and prevented from going about, molesting or bothering the other Party at his or her home, residence, place of employment, in public, or elsewhere, which proscription applies not only to the Parties hereto, but to his or her family members, agents, servants, or employees.

It is further **ORDERED** and **ADJUDGED** that the Parties hereto shall execute and deliver forthwith such deeds, titles and other documents as are necessary to give full effect to the terms and provisions of this Final Divorce Decree and the equitable distribution made herein.

It is further **ORDERED** and **ADJUDGED** that should any Party hereto file for bankruptcy protection under Federal law within five (5) years of the execution date of this agreement, such filing Party shall not be excused from the performance of any outstanding obligation hereunder, and such filing Party agrees, on the consideration stated, to reaffirm such obligation, immediately following any discharge in bankruptcy. Moreover, in case of such bankruptcy filing as envisioned by this paragraph, or in the event of a general default hereunder, each Party consents to the invasion and appropriation of the defaulting Party's pension, retirements, IRAs, or 401(k)s as a source of funds to enforce compliance and the right to assert a claim for child support or any other claim based upon this Order.

It is further **ORDERED** and **ADJUDGED** that unless otherwise agreed to, all beneficiary designations or appointments on any 401(k)s, IRAs, pensions, retirements, payable on death accounts, powers of attorney, medical directives, medical or financial releases of information,

34

trusts, wills, options, stocks or any personal property interest that has a survivorship provision or non-probate assets, in general, as between the Parties hereto, shall be deemed revoked. In addition, any and all joint tenancies shall hereby be dissolved in favor of co-tenancies; i.e., any real or personal property in which the Parties are titled as joint tenants or there are joint titles thereto, shall be deemed hereafter by the Parties as a tenancy in common. Lastly, all prior releases or permissions for access to the personal, medical or confidential information regarding either Party hereto shall be deemed to be revoked.

It is further **ORDERED** and **ADJUDGED** that the September 10, 2012 Final Order - Bifurcation, entered herein on or about September 27, 2012, shall remain in full force and effect until entry of this Final Divorce Decree, or until any appeal therefrom has concluded, whichever is later.

To all of which the Parties hereto do hereby **OBJECT** and **EXCEPT** as her or his interests may appear adversely affected hereby.

The Clerk of this Court is directed to mail certified copies of the entered Final Divorce Decree to all counsel of record.

And it appearing to the Court that there is nothing further to be done in this cause at this time, it is ORDERED that the same be omitted from the docket of this Court.

Pursuant to West Virginia Family Court Rule 22(c), you are hereby notified that this is a Final Order. Any party may file a motion for reconsideration of this Final Order as provided in *West Virginia Code* §51-2A-10. Any party aggrieved by this Final Order may take an appeal either to the Circuit Court or directly to the West Virginia Supreme Court of Appeals. A petition for appeal to the Circuit Court may be filed by either party within thirty (30) days after entry of this Final Order. In order to appeal

35

directly to the Supreme Court of Appeals, both parties must file, within fourteen (14) days after entry of this Final Order, a joint notice of intent to appeal and waiver of right to appeal to Circuit Court.

ENTERED this 19th day of SEPTEMBER 2013.

Honorable KEN BALLARD
FAMILY COURT JUDGE